GEORGE WELLMAN, APPELLANT,

*vs.*

SAMUEL BLOOD, ASSIGNOR OF BLOOD & DIX, APPELLEE,

*vs.*

HORACE WOODMAN, APPELLEE.   INTERFERENCE.

RIGHT OF APPEAL—INTERLOCUTORY DECISIONS NOT APPEALABLE—EXTENDING TIMES FOR TAKING TESTIMONY.—Interlocutory questions which arise in the course of the trial before the Commissioner, such as the question whether the times for taking testimony shall be extended, are submitted to the sound discretion of the Commissioner; and from his decision no appeal lies to the court, unless in case of gross abuse, which is not to be presumed.

INVENTION—REARRANGING AND SIMPLIFYING MACHINE PATENTABLE.—Rearranging the parts of a machine so as to dispense with several expensive pieces before considered necessary, thereby simplifying the machine and improving its operation, is a patentable invention.

EMPLOYER AND EMPLOYEE—ORIGINAL CONCEPTION—MECHANICAL DETAILS.—If the employer conceives the result embraced in an invention, or the general idea of a machine upon a particular principle, and in order to carry his conception into effect it is necessary to employ manual dexterity, or even inventive skill, in the mechanical details and arrangements requisite for carrying out the original conception, in such cases the employer will be the inventor and the servant will be the mere instrument by which he realizes his idea.

CONTRADICTION IN TESTIMONY—COMPARED WITH DEPOSITION.—The testimony of a witness may be compared with his deposition in a former interference relating to the same matter; and gross contradictions thereby appearing, not accounted for by any satisfactory explanations, will discredit his testimony.

CREDIT OF WITNESS—SUBORNATION—EFFECT OF.—A witness who gives false testimony as to one particular cannot be credited as to any, according to the legal maxim *falsus in uno, falsus in omnibus.* And if there be reason to suppose that his perjury or prevarication is the result of subornation, it affords a reasonable ground in a doubtful case for suspecting the testimony of other witnesses adduced by the same party.

(Before MORSELL, J., District of Columbia, March, 1856.)

## STATEMENT OF THE CASE.

The patent issued to George Wellman, No. 14,481, March 18th, 1856. (For diagram, see Patent Office Reports, 1856, vol. 3, p. 125.) The rules of practice referred to in the decision were as follows :

"43. If either party wishes a postponement of either the day for closing the testimony or the day of hearing, he must, before the day he thus seeks to postpone is past, show by affidavit a sufficient reason for such postponement."

"97. No notice will be taken at the hearing of any merely formal or technical objection, unless it may reasonably be presumed to have wrought a substantial injury to the party raising the objection; nor even then, unless, as soon as that party became aware of the objection, he immediately gave notice thereof to this Office and also to the opposite party, informing him at the same time that unless corrected he should urge his objection at the hearing." (Rules of 1855.)

MORSELL, J.

The first interference declared in this case was that of the claim or application for a patent of said Blood and the patent of said Horace Woodman for improvements in machinery for cleaning top cards of carding machines; during the pendency of which, and after certain depositions and proof taken and returned preparatory to the trial of the issue between said first-mentioned parties, the application of the said Wellman was made ; and before any decision as to priority, an interference was declared between the said Wellman and the said two other parties, and the time of trial appointed for the 30th of May, (afterwards extended to the 4th June, 1855.) Before said day of hearing, said Wellman, within the time limited by the forty-third rule of said Office, applied to the Commissioner, upon affidavit, for an extension of the time to complete the taking of his testimony. The grounds stated in the affidavit were deemed insufficient, and the application was refused.

Upon the trial of which issues the Commissioner decided—

First. That the interference between the respective parties was properly declared, and involved a combination of mechanism for

elevating the card and stripping it, by the motion derived from a cam or cams on the shaft of the card cylinder and the intermittent movement of the lifter and stripper-frame card, to card back and forth from one side of the card to the other.

Second. That George Wellman was properly refused a postponement of the day of hearing, because he did not state in his affidavit any particular facts material to show the priority of his invention which he could have proved by such postponement, but merely that he was advised that he ought to take additional evidence, and because he did not state what diligence he had used to procure testimony pending the interference.

Third. That the testimony of Woodman was properly admitted, though the counsel of Blood gave notice to the Office on the day of hearing that they objected to its admission for defect of notice; because counsel did not give notice of their objection to Woodman in the time required by the ninety-seventh rule of the rules and directions for proceedings in the Patent Office; and because to have refused to receive and hear his evidence would have been a surprise to Woodman, which it seemed was the object of the ninety-seventh rule to prevent; whereas, if the required notice had been given, he would have had an opportunity to retake his testimony.

Fourth. That the evidence of L. Cutter, a witness for Blood, was properly received, although objected to by the counsel for Woodman on the ground of the discrepancies between his deposition in this interference and the interference previously declared between Blood and Woodman, because on reference to the deposition of Cutter given in the interference between Blood and Woodman it does not appear that the discrepancy is such as to throw a cloud on his credibility, but was merely such as might have been the result of a defect of memory.

Fifth. That from the testimony it appears that Samuel Blood was the first and original inventor of the combination presented in his claim, and as such is entitled to a patent for the device as combined and applied and claimed by him in his application of the 10th of November, 1854.

Wellman appealed from this decision, and assigns for the reasons of his appeal—

First. Because reasonable and sufficient time was not allowed

to him to obtain all his material evidence to establish the date of his own invention and to show mistake or fraud in the dates of the drawings referred to in the evidence taken by said Blood and Woodman.

Second. Because the Commissioner based his decision, in part, upon evidence taken in a previously-declared interference between said Blood and Woodman, without any opportunity to said Wellman for cross-examination.

Third. Because the Commissioner, in coming to his decision, used a part only, and not the whole, of the evidence taken by Blood and Woodman in said previous interference between them.

Fourth. Because the decision of the Commissioner that said Blood was the first and original inventor of the thing claimed by him in his application is against the weight of the legal evidence.

The Commissioner has laid before me the original papers and the whole evidence in the cases of the interferences, together with the grounds of his decision touching the points involved by the reasons of appeal; and the time and place appointed for the hearing thereof being duly made known, the respective parties, by their counsel, filed with me their arguments in writing, and thereupon submitted the said case for my decision.

With respect to the reasons of appeal which raise the preliminary questions — granting or refusing further time upon the affidavit of the party stating the grounds of his application — it is a matter left to the sound exercise of discretion by the Commissioner, and from which no appeal lies, unless in case of gross abuse, which is not to be presumed.

With respect to the objection to the admissibility of a portion of the testimony, it will be duly regarded in the further investigation of the case.

I proceed to consider the merits of the issues between the parties; and that the evidence may be duly applied and appreciated, it will be necessary to look to the specifications and see what is the specific thing.

Wellman states, in substance, his to be:

1. A combination of mechanism for lifting and stripping the card by motion direct from cams or the shaft of the card cylinder.

2. The intermittent movement of the lifter and stripper from

card to card, back and forth, from one end of the card to the other.

The end or effect intended by each of the parties by their improvements appears to have been the same:

First. The question will be whether the inventions are substantially the same; and if so—

Second. Who was the prior and original inventor.

To decide which questions it will be necessary to examine the testimony.

Wellman's first, and one of his principal witnesses, is M. C. Bryant, who is admitted to be a machinist of talent and reputation. He states that he has been accustomed to examine and compare patented machinery and inventions; that he is an expert; that he made the drawing marked Exhibit "A" for Wellman in April, 1852; that it represents a modification of the stripping apparatus which he saw the model of, at that time, made by Mr. Wellman. He gives a particular description of the several parts of the drawing. At the time he made it he had knowledge of a model of a stripping machine, and since then he has had knowledge of Wellman's stripping machine, which was made in accordance with that model. A particular description of the several parts of said drawing is then given by the witness. He is required by a cross-interrogatory to state from what information he made the drawing. His answer is that he was invited by Mr. Hinckley, the superintendent of the Merrimac Company Mills, to go to his counting-room and see a model of a card-stripping apparatus which he said was made by Mr. Wellman. He went and saw it (the model). He was asked by Mr. Hinckley his opinion concerning it. Witness said that it had too much top-hamper, but that he thought it might be easily reduced. A few days after, he saw Mr. Wellman and told him the same in substance. He requested witness to make a drawing with such modifications, and offered to pay him for his trouble. He made the drawing and gave it to him. He offered to pay him. He refused to take any pay, considering the trouble on his part of making the change of little importance.

He is further asked, on cross-examination, whether he remembered the machine afterwards built by or for Mr. Wellman, and of which witness had spoken, and how, if at all, did it differ in the last-mentioned respect ("how were the parts shown for moving

the frame which carried the stripping apparatus'') from the model?
He answered: ''I think there was no essential difference.'' It
may be inferred from the testimony of Bean that he began to
work on said model in February, 1852. Witness, in stating the
difference between the model sent to Washington and the one
then shown him, says the latter is driven by a worm instead of a
pinion gear.

John S. Bradshaw, the next witness on the part of Wellman,
worked upon the two models just alluded to; received orders to
work on the second on the 12th of June, 1852; finished it
previous to the 23d of November, 1852. He states that he has
been accustomed to make models for machines for patents; that
he has invented and patented several machines, and has been
examined as an expert in patent cases in the United States
courts. He says the first working machine of Wellman's which
he saw was in 1853. He is asked to look at the second model
made by him, marked "George Wellman, Lowell, Massachu-
setts," and state the differences, if any, between that and the first
model made by him. In answer he states very fully and minutely
the differences, which are several. The length of the statement
is too great to admit of being here recited. It shows, however,
that by the change, or the new organized and combined arrange-
ment, in addition to the other differences in the present model, the
motion is communicated to the stripping shaft and cams by
means of a chain belt and gear pulleys, thereby dispensing with
those levers and couplings or tubes. The shaft, also, on the
second model which communicates the motion to the stripping-
shaft and cams with the gear pulleys is operated by a shaft lying
directly above it, on which is a gear, with a portion of the teeth
removed. This gear comes in contact with a pinion on the shaft
with the gear pulley, giving it sufficient rotary motion to turn
the stripping shaft and cams one entire revolution on their axis.
The shaft with the gear pulley and pinion then remain at rest
until the gear with a portion of the cogs removed again comes
in contact with the same. There is still another difference: at
the top of said upright shaft, instead of a worm and gear, as in
the first model, the motion is communicated to the stripping
shaft and cams by means of bevel gears. This witness states
also several important changes of a similar nature in Wellman's

first working machine since the first one he saw early in the year 1853; for which I refer to his answer to the appellant's interrogatory 22.

David G. Bean describes the difference thus: "In place of the worm gear, as seen in the model present, matching into the segment, is a pinion gear; the segment in the model, instead of teeth upon its periphery, has mangle pins; instead of the upright shaft from the mangle wheel in the model sent, the upper shaft has a chain belt to the main shaft; the cams, which upon the model sent are above the card, are placed upon the main shaft in the model; the lever that does the stripping, the end of which plays in the cams in the present model, is in the model sent hung on the curve about three or four inches from the main shaft; the lifting rod, which in the present model is outside of the cam, is in the model sent inside the cam; the strip card, which in the present model hangs upon a stand screwed on the segment arm, in the model sent is attached to an arm playing into the cam below."

Hinckley testifies to the same effect.

James F. Burgess, another witness for Wellman, says that he worked on the machines of Wellman; that he began on the 25th of April, 1853; that whilst so at work, about the end of June, 1853, Wellman told him that he was going to do away with the mangle wheel, and was going to use the segment as a mangle, thereby dispensing with a shaft and two large spur gears, "which I did on the last cards I built for him under his direction." In conformity to which principles Wellman's proof shows that he constructed various working machines which operated successfully in the years 1853 and 1854, and they were so placed in his last machine by Burgess.

In the absence of all opposing evidence the aforegoing proof must be deemed fully sufficient to establish the claim on the part of Wellman for the important improved invention, as stated by him in his specification. It appears that a number of machines have been constructed by him according to those principles, and have produced a perfect result as desired. This invention, in an organized combined state, shows the lifting and stripping cams placed on the main shaft of the card cylinder, the mangle pins in the segment on the lower end of the vibrating-arm (the mangle

wheel is dispensed with and the segment used as a mangle, whereby a new element or constituent feature is substituted in the place of a mangle wheel and two large spur gears), by which means the object is attained, and much better by reason of an accellerated motion produced in the lifting and stripping. The construction is less complicated and more simple. By such an arrangement of the parts, and dispensing with costly machinery, the mode of operation becomes much more economical and cheaper. This arrangement, by which the omission of a part of the machinery previously used and considered essential in the construction of the machine, under the circumstances just stated, constitutes of itself sufficient patentable invention.

The proof further is that this improved feature is exhibited by the drawing made in April or May, 1852. That drawing was made by M. C. Bryant, and it is contended that the particular improved invention was his, and not Wellman's. Bryant himself does not say so. He says, as before stated, that he made the drawing for Wellman, and that whatever appears on the face of it was made at the same time or a few days after. He states, as already noticed, what it represents, and of his having seen the model of Wellman shown to him; and the information that he made the drawing from; and that the modification which he proposed was assented to by Wellman. He had seen a machine built by or for for Mr. Wellman which did not essentially differ from the model in respect to its being moved by means of an intermittent-moving pinion engaging with pins on a mangle wheel. Wellman offered to pay him for the modification and drawing which he had made for him, but he refused to take any pay, considering the trouble on his part of making the change of little importance. The change was in respect to the top-hamper, which he thought might be easily reduced. He explains more particularly what he means by the top-hamper. But the general idea which embraced the principle of the improvement, I think, appears to have been conceived by Wellman, and I take the rule to be this: If the employer conceives the result embraced in the invention, or the general idea of a machine upon a particular principle, and in order to carry his conception into effect, it is necessary to employ manual dexterity, or even inventive skill, in the mechanical details and arrangements requisite for carrying

out the original conception; in such cases the employer will be the inventor, and the servant will be a mere instrument through which he realizes his idea.

But it is further contended that Wellman did not approve of the modification as to the arrangement of cams on the main shaft. The evidence, I think, does not warrant this conclusion, as it is shown that he did after a time construct machines upon precisely the same principles, and that his reasons for not applying that arrangement to old cards was the want of a sufficient length of shaft and the practical difficulty of keeping the machinery clean; so that the inference drawn from that fact is unfounded.

If the view thus taken be correct, Wellman conceived the idea of the improvement, and practically reduced it, according to the established rule of law, in April, 1852.

The proof to sustain Mr. Blood's claim as prior inventor will be next considered. He supposes that his evidence establishes the date of his invention, as exhibited by his model and drawings, as early as March, 1846; and if he is right about this, he must unquestionably be considered the prior and original inventor on this issue, if the invention is the same substantially as claimed and proved by Wellman.

Lorenzo Cutter and Eben P. Blood are the two witnesses by whom this prior invention is supposed to be proved, and such is the tendency of their testimony, if what they have said be true; but it has been objected that they are unworthy of belief, and that no credit ought to be given to what they have testified. The particular circumstances urged in support of the objections appear to be the relation in which they stand to the party, Mr. Blood—Blood being a brother and Cutter a brother-in-law; that Cutter has been guilty of gross contradiction of himself, both in terms and spirit, in his testimony as given in the first and second depositions. In his first deposition, in answer to the first interrogatory on the part of Blood—in these words, "When did you first learn or understand that said Blood was designing and trying to invent this machine?—he answered: "In February, 1853; I did not fully understand Blood's explanations." To the seventh interrogatory by same—"Have you seen any drawing of his machine; if so, when for the first time?—he answered: "I have; I saw it in June, 1853, for the first time." The draw-

ing marked Exhibit "A B" is shown to him, and is annexed to his first deposition. This, he answers, was the drawing of the machine shown to him for the first time in June, 1853.

In his second deposition, which was taken at the instance of Mr. Blood in about four weeks, to the question put to him by Blood's counsel—"State whether you were knowing to said Blood's having previously to February, 1853, been endeavoring to design and construct a self card-stripping machine; where did you first hear that he was designing such a machine"—he answers: "I had; I first learned it in April, 1846; I then saw a drawing of part of a machine for stripping cards, which represented the arm slides and cams." He is shown a drawing purporting to have been made March 14th, 1846, and says the writing on the drawing is in the handwriting of Blood; and it is his impression that it is the same one (it is annexed to his deposition) shown to him the 14th of March, 1846, and of which he then had knowledge. In answer to an interrogatory put to him he says that he was no mechanic; never made a drawing; entirely unskilled; and never saw more than a few drawings. Yet, on this occasion, and on that of the drawings shown to him as of September, 1849, he undertakes and proceeds to describe in the most minute and scientific manner the various parts and intended operations of all the said drawings as relates to said alleged improvements. The reasons he gives to explain these gross contradictions are unsatisfactory. It cannot be true that he misapprehended the questions, or that he was too sick to answer truly what he did answer. It was seen in the interval between the two examinations that there was a deficiency in the proof, and this witness seems to have undergone a preparation to supply that deficiency. Sensible of the objections which have been urged as to the credibility of this witness, resort has been had to Eben P. Blood. From his ignorance and strange conduct in the course of the examination there is less reason to confide in the truth of what he says than in that of Cutter. He says he is no mechanic; never drafted any plan, nor ever examined any, except the one he was about to testify of. He describes the copy shown to him to be a true copy of the original, which he had not seen, according to his account, for nine years, or talked about it with any one. He shows the most gross prevarications and falsehoods

to guard against committing himself. He appears to have been under a very improper influence. There is strong circumstantial proof, also, going to show the falsehood of what those two witnesses have testified to. The first is the lapse of time which is suffered to take place before he made application for a patent, without any good reason for the delay, if what they have said was true.

His own witnesses, called by him in the course of the second examination, some of whom had stood in the most intimate and confidential relation to him, some of them working in the very shop with him—why are these drawings not spoken of and shown to some of these witnesses before the year 1853, when they are so made known to them by Blood as evidence of his invented improvement? It is especially worthy of notice that from his remarks to Jamieson, one of his witnesses, he plainly shows that no such drawings had been made. Jamieson states—having seen certain detached scraps of drawings on sand-paper and pieces of wood in Blood's drawer, and Blood at work on them, and that the more full drawings were made from these detached drawings—that when he mentioned having seen them to Blood, his reply was, "I shall soon have an opportunity to let you see a full drawing." Does not that imply that he had not then made them? This took place in the spring of 1853.

None of his other witnesses prove his invention to have been earlier than the year 1853. The rule of law as to the credibility of the testimony of witnesses, which I feel myself bound to take as my guide on this occasion, is: "That a witness who gives false testimony as to one particular cannot be credited as to any, according to the legal maxim *falsus in uno, falsus in omnibus.*" Again : " If there be reason to suppose that his perjury or prevarication is the result of subornation, it affords a reasonable ground in a doubtful case for suspecting the testimony of other witnesses adduced by the same party."

I am therefore satisfied that Blood cannot be considered the first and original inventor of the improvement involved in this issue.

With the aforegoing views, it becomes unnecessary to give any opinion on the question of the admissibility of the copies of drawings given in evidence.

With respect to Woodman's claim, I need say but little.   He has his patent, and cannot be affected in this mode of proceeding. I am satisfied that there are substantial differences between his invention and that of Wellman's in this case.   Upon the whole, I am of opinion, and do so decide, that Wellman, the appellant, is the first and original inventor of the improvement aforesaid claimed by him, and ought accordingly to have a patent therefor.

*J. Giles*, for the appellant.

*Sam'l Cooper* and *A. B. Stoughton*, for the appellee.